```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

INTERPHARM, INC.,                  :

                Plaintiff,         :   08 Civ. 11365 (RJH)(HBP)
    -against-
                                   :   OPINION
WELLS FARGO BANK, NATIONAL             AND ORDER
ASSOCIATION,                       :

                Defendant.         :

-----------------------------------X
```

PITMAN, United States Magistrate Judge:

I. Introduction

By notice of motion dated March 2, 2009 (Docket Item 4), plaintiff, Interpharm, Inc. ("Interpharm") moves to disqualify Jeffrey A. Wurst, Esq. and his former firm,[1] Ruskin, Moscou, Faltischek, P.C. ("Ruskin, Moscou") from representing defendant Wells Fargo Bank, National Association ("Wells Fargo") in this matter. For the reasons set forth below, the motion is denied without prejudice.

---

[1] The docket sheet in this matter indicates that Wurst is now with the firm of Rumberger, Kirk & Caldwell in Orlando, Florida. I assume he is no longer a member of or associated with Ruskin Moscou.

II.  Facts

    A.  Overview of
        Plaintiff's Allegations

This action arises out of the financial collapse of Interpharm, a manufacturer of pharmaceuticals.  In summary, Interpharm alleges that Wells Fargo, Interpharm's principal secured creditor, was responsible for its collapse because Wells Fargo progressively imposed more draconian conditions on Interpharm as a condition to forbearing from foreclosing on its collateral, allegedly in violation of the lending agreements between the two.  According to Interpharm, the conditions became so restrictive that they prevented Interpharm from doing business and left it with no alternative to going out of business.  Wells Fargo not only alleges that it did not breach any covenants with Interpharm, it also claims that it repeatedly entered into the forbearance agreements in a good-faith effort to keep Interpharm in business.  According to Wells Fargo, Interpharm's failure was due to mismanagement and had nothing to do with its efforts to limit its exposure as a creditor.  As set forth in more detail below, the motion to disqualify grows out of Wurst's alleged involvement in the discussions between Interpharm and Wells Fargo that resulted in the forbearance agreements.

The complaint alleges the following facts. Until mid 2008, Interpharm was in the business of manufacturing and selling the generic forms of various prescription and non-prescription medications (Compl. ¶ 11). Beginning in 2006, Wells Fargo and Interpharm entered into a Credit and Security Agreement under which Wells Fargo provided a $41 million "credit facility" to Interpharm, including a revolving line of credit of up to $22.5 million. The Credit and Security Agreement's termination date was February 10, 2010 (Compl. ¶ 16). The line of credit was secured by Interpharm's accounts receivable, eligible inventory and equipment, among other things (Compl. ¶ 17).

Interpharm's performance in 2007 was not as successful as expected and by sometime by mid-2007 it was in default under the Credit and Security Agreement (Compl. ¶¶ 24-25). Wells Fargo advised that it would forebear from enforcing its rights under the Credit and Security Agreement only if Interpharm were able to find additional sources of credit that were willing to be subordinate to Wells Fargo (Compl. ¶ 26). Interpharm agreed to Wells Fargo's conditions and obtained additional credit from other sources (Compl. ¶ 26).

The amount of credit available to Interpharm under the Credit and Security Agreement was dependent on certain discretionary judgments concerning Interpharm's inventory and accounts

receivable (see generally Compl. ¶¶ 18-20). In general terms, the amount of credit Wells Fargo was obligated to extend was proportional to the value it assigned to Interpharm's inventory and accounts receivable. In October 2007, Wells Fargo began excluding the receivables owed by Cardinal Healthcare from Interpharm's assets which had the effect of diminishing the amount of credit available to Interpharm under the Credit and Security Agreement (Compl. ¶ 27).

In October and November 2007, the parties entered into a Forbearance Agreement ("November 2007 Forbearance Agreement"). In return for certain additional payments and commitments from Interpharm, Wells Fargo agreed to extend an additional $2 million to Interpharm. Among other things, the November 2007 Forbearance Agreement required Interpharm to raise an additional $8 million in subordinated debt (Compl. ¶ 28). It also required that Interpharm's net income before taxes and cash flow be positive in the month of November 2007 and for the entire quarter ending December 31, 2007 (Compl. ¶ 29).

Interpharm was unable to meet the November 2007 Forbearance Agreement's requirements for the month of November 2007 and the quarter ending December 31, 2007, and was again in non-compliance with its covenants with Wells Fargo (Compl. ¶¶ 30, 34). In response, Wells Fargo proposed new financial covenants

for the first half of 2008 to which Interpharm agreed (Compl. ¶ 32). Although the chronology is not entirely clear from the complaint, Interpharm appears to allege that Wells Fargo had improperly restricted the credit it was extending to Interpharm by disregarding the receivables from four large customers of Interpharm (Compl. ¶¶ 36-41, 48-49 ). Interpharm alleges that this caused and/or exacerbated any financial problems it was experiencing (¶ 41) and appears to claim that Wells Fargo's credit restriction was a substantial factor contributing to Interpharm's financial problems.

In February 2008, Wells Fargo and Interpharm entered into another forbearance agreement ("February 2008 Forbearance Agreement") (Compl. ¶ 53). This agreement required Interpharm to reduce its payroll expense, to liquidate real estate valued at $20 million and to take other steps to pay down its debt to Wells Fargo (Compl. ¶ 54).

In March 2008, Wells Fargo advised Interpharm that it was going to further restrict the credit being made available under the Credit and Security Agreement based on its re-evaluation of the liquidation value of Interpharm's inventory; according to Interpharm, there was no valid reason for this action and it constituted a material breach of the February 2008 Forbearance Agreement (Compl. ¶¶ 61, 64). Interpharm claims that these new

credit restrictions made it impossible to comply with the requirements of the February 2008 Forbearance Agreement (Compl. ¶ 65).

In March 2008, Wells Fargo and Interpharm entered into yet another Forbearance Agreement ("March 2008 Forbearance Agreement") (Compl. ¶¶ 70-71). Interpharm alleges that the restrictions on credit Wells Fargo had previously imposed had pushed it to the brink of bankruptcy and that it had no viable alternative to the new forbearance agreement (Compl. ¶¶ 71, 74). Among other things, the March 2008 Forbearance Agreement required an additional cash payment to and release of all claims against Wells Fargo, and a written acknowledgment that Wells "ha[s] complied in good faith" with its contractual obligations to Interpharm (Compl. ¶¶ 72, 76, 77). Although the March 2008 Forbearance Agreement did relax some of the restrictions Wells Fargo had previously imposed (Compl. ¶ 79), Interpharm claims that the relief afforded was too little and too late and created a situation in which Interpharm was ultimately forced into liquidation (Compl. ¶¶ 79-81). Interpharm claims that "[b]ut for Wells Fargo's wrongful restriction of available credit, Interpharm would likely have refinanced the entire amount owing to Wells Fargo by June 30, 2008 and would not have had to sell

6

the company's assets at a significantly decreased price" (Compl. ¶ 82).

As a result of the forgoing and other allegedly improper conduct by Wells Fargo, Interpharm has asserted claims against Wells Fargo for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with business expectations, unjust enrichment and breach of fiduciary duty.

Wells Fargo claims that the action is nothing more than a baseless attempt to shift the blame for Interpharm's deficient management to its secured creditor (Defendant Wells Fargo's Memorandum of Law in Opposition to Plaintiff's Motion to Disqualify, dated April 6, 2009 ("Def't's Opp'n Mem."), at 2).  Wells Fargo claims that the six forbearance agreements it entered into with Interpharm were repeated good-faith attempts to bail Interpharm out and to provide it with a series of "second chances" (Def't's Opp'n Mem. at 2).  Wells Fargo also notes that each of its forbearance agreements contained a release by Interpharm of all claims against Wells Fargo and argues that plaintiff's claims are not only unsupported by the historical facts, but are also barred by Interpharm's release (Def't's Opp'n Mem. at 2).

B.  Facts Underlying
    <u>Motion to Disqualify</u>

Interpharm's motion to disqualify arises out of Wurst's alleged involvement in the various forbearance agreements. Interpharm claims that Wurst attended a meeting between Interpharm and Wells Fargo on January 28, 2008 and made a 20-minute presentation concerning the conditions under which Wells Fargo would be willing to enter into a new forbearance agreement (Affidavit of Richard J. Miller, sworn to February 27, 2009 ("Miller Aff."), ¶ 3).  Wurst also allegedly "took the lead" in negotiations between Interpharm and Wells Fargo with respect to agreements dated February 1, February 5 and March 17, 2008 and in other unspecified negotiating sessions (Miller Aff. ¶¶ 4-6). Interpharm also claims that Wurst refused to sign certain documents concerning the sale of Interpharm's real property which resulted in the buyer's having to pay additional transfer taxes and a reduction in the net proceeds received by Interpharm (Miller Aff. ¶ 8).  Finally, Interpharm also claims that Wurst had unspecified telephone communications with one of Interpharm's Directors in which no other Wells Fargo representative participated and had unspecified communications with Interpharm's Chief Recovery Officer in which no other Wells Fargo representative

participated (Affidavit of Richard J. Miller, sworn to April 18, 2009.

III.  <u>Analysis</u>

Interpharm claims that Wurst and Ruskin, Moscou should be disqualified because Wurst ought to be called as a witness on behalf of Wells Fargo and may be called as a witness by Interpharm to give testimony that might be prejudicial to Wells Fargo.

"'Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions' under the witness-advocate rule." <u>Murray v. Metro. Life Ins. Co.</u>, 583 F.3d 173, 178 (2d Cir. 2009), <u>quoting</u> <u>Lamborn v. Dittmer</u>, 873 F.2d 522, 531 (2d Cir. 1989); <u>accord</u> <u>Jews for Jesus, Inc. v. Town of Oyster Bay</u>, CV 09-2088, 2010 WL 256670 at *2 (E.D.N.Y. Jan. 21, 2010); <u>Ross v. Blitzer</u>, 09 Civ. 8666 (HB), 2009 WL 4907062 at *2 (S.D.N.Y. Dec. 21, 2009) (Baer, D.J.); <u>Amusement Indus., Inc. v. Stern</u>, 657 F. Supp. 2d 458, 460 (S.D.N.Y. 2009) (Gorenstein, M.J.); <u>see</u> <u>also</u> <u>First Trust Nat'l Assoc. v. Moses & Singer</u>, 99 Civ. 1947 (JSM), 2000 WL 1093054 at *6 (S.D.N.Y. Aug. 4, 2000) (Martin, D.J.)("Motions to disqualify opposing counsel are viewed with disfavor because they impinge on a party's right to employ the counsel of it's

choice."). "The movant, therefore, 'bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's] client is substantial.'" Murray v. Metro. Life Ins. Co., supra, 583 F.3d at 178, quoting Lamborn v. Dittmer, supra, 873 F.2d at 531; see also Gormin v. Hubregsen, 08 Civ. 7674 (PGG), 2009 WL 508269 at *2 (S.D.N.Y. Feb. 27, 2009) (Gardephe, D.J.) ("The party seeking disqualification must bear a heavy burden of proof in order to prevail and mere speculation will not suffice."); Rice v. Baron, 456 F. Supp. 1361, 1371 (S.D.N.Y. 1984) (Carter, D.J.) ("[T]he moving party bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial." (inner quotations omitted)).

Effective April 21, 2009, New York adopted the Code of Professional Conduct ("Conduct Code"), replacing the Model Code of Professional Responsibility. Rule 3.7 of the Conduct Code provides guidance concerning when a lawyer who will also be a witness should be disqualified:

> (a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
>
> > (1) the testimony relates solely to an uncontested issue;

>   (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
>
>   (3) disqualification of the lawyer would work substantial hardship on the client;
>
>   (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
>
>   (5) the testimony is authorized by the tribunal.
>
>   (b) A lawyer may not act as advocate before a tribunal in a matter if:
>
>   (1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client . . . .

22 N.Y.C.R.R. § 1200.0 (2009).[2]

Three principal concerns underlie the qualified prohibition against a lawyer serving as an advocate and a witness in the same proceeding: "(1) the lawyer will appear to vouch for his own credibility, (2) the lawyer's testimony will put opposing counsel in a difficult position when he has to vigorously cross-examine his lawyer-adversary and seek to impeach his

---

[2]Although federal courts considering motions for disqualification routinely consider state disciplinary rules, such rules "merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification . . . ." Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005), citing Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).

credibility, and (3) there may be an implication that the testifying attorney may be distorting the truth as a result of bias in favor of his client." Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 282-33 (2d Cir. 2004); accord Amusement Indus., Inc. v. Stern, supra, 657 F. Supp. 2d at 461. To warrant disqualification under subdivision (a), it is not enough that the lawyer-witness is a member of the trial team. Rather, disqualification under subdivision (a) is warranted only where the lawyer-witness will actually advocate before the jury. Murray v. Metro. Life Ins. Co., supra, 583 F.3d at 179. In addition, the testimony that will warrant disqualification under subparagraph (b) is "testimony that is 'sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." Murray v. Metro. Life Ins. Co., supra, 583 F.3d at 178, quoting Lamborn v. Dittmer, supra, 873 F.2d at 531.

  Because these concerns arise only when an attorney appears as both witness and advocate before the fact finder, see Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981) (disqualification is appropriate only where there is "a significant risk of trial taint"), "numerous courts in this District have held that [the advocate-witness rule] addresses [only]

12

counsel's participation at trial, and does not bar counsel's participation in pre-trial proceedings." Gormin v. Hubregsen, supra, 2009 WL 508269 at *3; accord Ross v. Blitzer, supra, 2009 WL 4907062 at *4 n.5; Amusement Indus., Inc. v. Stern, supra, 657 F. Supp. 2d at 461-62; Lyman v. City of Albany, 06-CV-1109 (LEK/DRH), 2007 WL 496454 at *4 (N.D.N.Y. Feb. 12, 2007); A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 160 F. Supp. 2d 657, 665 (S.D.N.Y. 2001) (Leisure, D.J.), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Ragdoll Prods. (UK) Ltd. v. Wal-Mart Stores, Inc., 99 Civ. 2101 (DLC), 1999 WL 760209 at *2 (S.D.N.Y. Sept. 27, 1999) (Cote, D.J.); Rosefield v. Orentreich, 98 Civ 2721 (TPG), 1998 WL 567750 at *6 (S.D.N.Y. Sept. 4, 1998) (Griesa, D.J.); Conigliaro v. Horace Mann Sch., 95 Civ. 3555 (CSH), 1997 WL 189058 at *4 (S.D.N.Y. Apr. 17, 1997) (Haight, D.J.); NL Indus., Inc. v. PaineWebber Inc., 88 Civ. 8602 (MBM), 1990 WL 43929 at *3 (S.D.N.Y. Apr. 9, 1990) (Mukasey, D.J.); Fenn & Fenn, Inc. v. MacQueen, 88 Civ. 4196 (CSH), 1989 WL 58041 at *8 (S.D.N.Y. May 15, 1989) (Haight, D.J.); New York Inst. of Tech. v. Biosound, Inc., 85 Civ. 4326 (LBS), 1987 WL 11749 at *1 (S.D.N.Y. Jan. 27, 1987) (Sand, D.J.).

Application of the foregoing principles to the pending motion requires that the motion be denied.  First, Interpharm offers no evidence whatsoever that Wurst will offer any testimony

13

or has any information that would warrant his disqualification under Rule 3.7(a) or the disqualification of his firm under rule 3.7(b). Although Interpharm confidently states "If not Interpharm's star witness, Wurst will be among the most prominent," (Memorandum of Law in Support of Plaintiff's Motion to Disqualify Defendant's Counsel, dated March 2, 2009, at 15), it fails to offer any evidence to support its bombast. At this stage, there is no evidence that even suggests that Wurst has unique, non-privileged testimony that would be favorable or unfavorable to either side. See Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994) ("Disqualification may be required only when it is likely that the testimony to be given by [counsel] is necessary." (inner quotation marks omitted)). Moreover several undeniable facts strongly suggest that plaintiff's contentions about Wurst's significance as a witness are either baseless or little more than wishful thinking. The final forbearance agreement contains both a release and a merger clause (Exhibit A to the Affidavit of Robert Ostrowe, sworn to April 6, 2009, ¶¶ 4(e) and 31). These provisions create formidable barriers to the admission of oral testimony concerning the negotiations and the events that lead up to the final forbearance agreement, and it is far from clear at this stage that any testimony concerning what occurred during the parties' multiple negotiating sessions will

be admissible.  In addition, "[t]he mere fact that a law firm assists in preparing an agreement that is later the subject of litigation does not automatically mean that the firm must be disqualified."  Fenn & Fenn, Inc. v. MacQueen, supra, 1989 WL 58041 at *8; see also Am. Special Risk Ins. Co. v. Delta Am. Re Ins. Co., 634 F. Supp. 112, 122 (S.D.N.Y. 1986) (Leval, D.J.) (denying motion to disqualify counsel where defendants failed to show that plaintiff's counsel "were intimately involved in the negotiation and drafting of the [a]greements, although they may have been present at the negotiation sessions"); S & S Hotel Ventures Ltd. P'ship v. 777 S.H. Corp., 69 N.Y.2d 437, 446, 508 N.E.2d 647, 651-52, 515 N.Y.S.2d 735, 740 (1987).

        Second, disqualification would be entirely premature at this stage.  As noted above, the concerns that justify disqualification of an attorney who will be a witness are not implicated at the pretrial stage.  Even if the complaint survives Wells Fargo's pending motion to dismiss, the matter is still a long way from trial.  Discovery has yet to be completed, and, in all probability, summary judgment motions will have to be resolved before the matter is ready for trial.  Even if Wurst had admissible, non-privileged and non-cumulative testimony, the motion to disqualify is simply premature at this point in time.  Ross v.

15

Blitzer, supra, 2009 WL 4907062 at *4; A.V. by Versace, Inc. v. Gianni Versace, S.p.A., supra, 160 F. Supp. 2d at 664.

Since plaintiff has shown neither that Wurst has admissible, non-privileged and non-cumulative testimony that would even be of use to either side nor that the concerns underlying the disfavor of advocate-witnesses are implicated at this early pre-trial stage, plaintiff's motion to disqualify Wurst and Ruskin, Moscou is denied without prejudice to renewal.

IV. Conclusion

Accordingly, for all the foregoing reasons, plaintiff Interpharm's motion to disqualify Jeffrey A. Wurst, Esq. and his law firm, Ruskin Moscou Faltischek, P.C. is denied without prejudice to renewal. The Clerk of the Court is directed to mark Docket Item 4 closed.

Dated: New York, New York
       March 25, 2010

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies transmitted to:

Neal W. Cohen, Esq.
Alan D. Halperin, Esq.

```
Halperin Battaglia Raicht, LLP
9th Floor
555 Madison Avenue
New York, New York   10022

John E. Frey, Esq.
Michael, Dockterman, Esq.
Wildman Harrold Allen & Dixon, LLP
Suite 2800
225 West Wacker Drive
Chicago, Illinois   60606

Douglas J. Good, Esq.
Robert F. Regan, Esq.
Ruskin Moscou Faltischek, P.C.
East Tower
15th Floor
1425 RexCorp Plaza
Uniondale, New York   11556

Jeffrey A. Wurst, Esq.
Rumberger, Kirk & Caldwell
Suite 1400
300 S. Orange Avenue
Orlando, Florida   32801
```