UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERPHARM, INC.,

                                        Plaintiff,

                        -against-

WELLS FARGO BANK, N.A.,

                                        Defendant.

08 Civ. 11365 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

    In this action, a now-defunct generic pharmaceutical company, Interpharm, Inc.
("Interpharm"), is suing its lender, Wells Fargo Bank, N.A. ("Wells Fargo" or the
"Bank") for breach of contract and related claims.  Wells Fargo has moved to dismiss the
action on the ground that Interpharm waived all claims against it in a release it signed on
May 14, 2008.  For the reasons below, Wells Fargo's motion is granted in part and denied
in part.

## BACKGROUND

    For the purposes of this motion, the following allegations are taken as true.  Until
the sale of substantially all of its assets and property in June 2008, Interpharm was in the
business of manufacturing and selling generic pharmaceutical drugs.  (Compl. ¶ 11.)
Among its major customers were three large drug wholesalers, McKesson,
AmerisourceBergen, and Cardinal Health.  (*Id.* ¶ 12.)  In 2006, the company was
planning to expand its business, and it needed more credit.  (*Id.* ¶ 15.)  Wells Fargo had
expressed interest in financing Interpharm, and on February 9, 2006, the parties entered

into a Credit and Security Agreement (the "Credit Agreement") whereby Wells Fargo

agreed to make certain secured loans and advances to Interpharm.  (*Id.* ¶ 16.)  This

included a revolving line of credit[1] of up to $22.5 million (the "Revolving Line") secured

by collateral in Interpharm's "accounts receivables, rights to payment, general

intangibles, inventory, and equipment."  (*Id.* ¶ 17.)  The amount of credit available to

Interpharm in the Revolving Line—its "borrowing base"—was variable.  (*Id.* ¶ 18.)  It

depended on, among other things, the total amount of its eligible accounts and the value

of its eligible inventory.  (*Id.*)  For example, the borrowing base included 85 percent of

Interpharm's "eligible accounts," which the Credit Agreement defined as "all unpaid

Accounts arising from the sale or lease of goods or the performance of services, net of

any credits, but excluding" accounts with certain specified characteristics.  (*Id.* ¶ 19;

Wurst Decl. Ex. A at 5.)  Thus if Interpharm was owed $10,000 in an eligible account

from a wholesaler, its borrowing base would go up by $8,500.  (Compl. ¶ 19.)  Similarly,

Interpharm's borrowing base included some percentage of its "eligible inventory"

(another term specifically defined in the Credit Agreement), which, in general terms, was

defined as 50 percent of its cost "or such lesser rate as [Wells Fargo] in its reasonable

discretion may deem appropriate from time to time."  (*Id.*)  The Credit Agreement

allowed Wells Fargo to exclude inventory as ineligible "in its commercially reasonable

discretion," and to apply different advance rates (as opposed to the specified rate of 50

percent) to eligible inventory if it deemed such rates "appropriate" "in its reasonable

discretion."  (*Id.* ¶ 20.)

---

[1] Wells Fargo's website defines a revolving line of credit as one "that lets your business borrow, repay, and borrow again up to the original amount committed by Wells Fargo, throughout the life of the loan." Commercial Loans: Lines of Credit, *available at* https://www.wellsfargo.com/com/bus_finance/lines_ credit.jhtml (last visited March 29, 2010).

In 2007, Interpharm suffered lower-than-expected sales and high expenses, and its net income declined from the previous fiscal year.  (*Id.* ¶ 22.)  The complaint cited increased development costs and increased competition as culprits.  (*Id.*)  Still, through June of that year, Interpharm had "significant unused available credit in the Revolving Line."  (*Id.*)  As of the end of June, availability exceeded $5.9 million.  (*Id.* ¶ 23.)  In the third quarter of 2007, however, revenue fell, which "put Interpharm in default."  (*Id.* ¶ 25.)  Under the Credit Agreement, this entitled Wells Fargo to, among other things, "declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrower expressly waives." (Wurst Aff. Ex A. at 57.)  Wells Fargo was also entitled to

> exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process . . . and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties) and, in connection therewith, the Borrower will on demand assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties . . . .

(*Id.*)

In August 2007, notwithstanding Wells Fargo's right to exercise default remedies under the Credit Agreement, it "began to negotiate with" Interpharm to allow it more time to "get back on its feet."  (Compl. ¶ 26.)  In October 2007, while negotiations went on, Wells Fargo began to exclude the receivables of Cardinal Healthcare from eligible accounts.  (*Id.* ¶ 27.)  The exclusion reduced plaintiff's borrowing base under the Revolving Line, which Interpharm perceived as part of Wells Fargo's strategy to strong-arm Interpharm into agreeing to the Bank's onerous proposed terms.  (*Id.* ¶¶ 27, 28.)

Whether that was the Bank's strategy or not, the parties did enter into a Forbearance Agreement on October 26, 2007 (the "October 2007 Agreement"). (*Id.* ¶¶ 27, 28.) Wells Fargo agreed to add two million dollars to the Revolving Line[2] and to forbear from exercising its rights against Interpharm until December 31, 2007. (*Id.*) In turn, Interpharm acknowledged that it owed Wells Fargo the principal amount of $30,032,630.29 plus interest and costs[3] and that it was in default; agreed to raise additional capital[4] and $8 million in subordinated debt by November 15, 2007; and released all claims against Wells Fargo arising at or prior to the date of the October 2007 Agreement. (*Id.*; Wurst Decl. Ex. C, October 2007 Agreement, at ¶¶ 4(a), 4(d), 6, 10, 11(c), 14.) The October 2007 Agreement was amended a few weeks later, on November 13, 2007 (the "November 2007 Amendment"), to reflect that Interpharm had raised $3 million of subordinated debt and would raise another $5 million of the same by November 15, 2007. (Wurst Decl. Ex. C, November 2007 Agreement, at 1.) Substantively, however, all other "terms and conditions of the [October 2007] Forbearance Agreement [were to] remain in full force and effect." (*Id.*)

The October 2007 Agreement added certain terms to the Credit Agreement, including a requirement that Interpharm achieve a before-tax net income of at least $500,000 and a net cash flow of at least $600,000 for the last quarter of 2007. (Wurst Decl. Ex. C, October 2007 Agreement, at ¶ 11(a), (b).) The complaint sees these and

---

[2] Although the complaint does not expressly say so, presumably this increased the Revolving Line from $22.5 million to $24.5 million.

[3] As of October 1, 2007, Interpharm owed the Bank, in addition to interest and fees, a principal amount of $30,032,630.29 (Wurst Decl. Ex. C, October 2007 Agreement, at 2); as of January 29, 2008, it owed $30,204,496 in principal (Wurst Decl. Ex. C, February 2008 Agreement, at 3); as of March 24, 2008, it owed $30,928,858.02 in principal (Wurst Decl. Ex. C, March 2008 Agreement, at 4); and as of May 1, 2008, it owed $29,352,988.33 in principal (Wurst Decl. Ex. B, at 5). The parties do not itemize the reasons why the principal crept upward, and then downward again, during this period.

[4] Although the complaint makes this allegation, the Court sees no provision within the October 2007 Agreement requiring such a capital infusion. (*See generally* Wurst Decl. Ex. C, October 2007 Agreement.)

4

other terms of the October 2007 Agreement as unfair.  (Compl. ¶ 29.)  It points to "exorbitantly high" interest rates and fees.  (*Id.*)  And it asserts that Wells Fargo knew the net income and cash flow requirements for November 2007 and the fourth quarter of 2007 were unrealistic—Interpharm had said during negotiations that the income targets were "unattainable" and "unreasonable" and that it could not promise it would meet them—and made Interpharm agree to them anyway, by "vaguely propos[ing] to negotiate new financial covenants for the first half of 2008."  (*Id.* ¶¶ 29, 30, 31, 32.)  Notably, the complaint does not allege that this "vague propos[al]" was actually part of the October 2007 Agreement's terms—just that it trusted "Wells Fargo's good faith" to renegotiate the 2008 financial covenants.[5]  (*Id.* ¶ 32.)

In early January of 2008, Interpharm notified Wells Fargo it would not meet its 2007 income targets and would be in what it called "technical non-compliance" with the October 2007 Agreement.  (Compl. ¶ 34.)  Although Interpharm claims that Wells Fargo should have known the income targets were unrealistic, the Bank treated its non-compliance as a default on the October 2007 Agreement and began charging Interpharm higher interest and costs—actions it calls "were commercially unreasonable and inconsistent with the intentions of the parties when entering into the [October 2007] Agreement."[6]  (*Id.*)

That same month, Wells Fargo said it "wanted out" of the loan.  (*Id.* ¶¶ 35, 45.)  On January 20, without any "commercially reasonable basis," it began to treat the

---

[5] Indeed, the October 2007 Agreement did not contain such a provision.  The Credit Agreement's requirements with respect to before-tax net income and net cash flow still governed.  (*See* Wurst Decl. Ex. A, at 45.)  Moreover, the October 2007 Agreement provided that, "[a]t the conclusion of the Forbearance Period, Wells Fargo shall establish financial covenants for the second half of fiscal year 2008 that are acceptable to Wells Fargo in its sole discretion."  (Wurst Decl. Ex. C, October 2007 Agreement, at ¶ 21.)
[6] It is unclear whether Interpharm's claim is that the Credit Agreement or October 2007 Agreement barred Wells Fargo from charging such interest rates or fees, or merely that it was unfair for Wells Fargo to have held Interpharm to unrealistic income targets.

Cardinal Health, AmerisourceBergen, and McKesson accounts, which comprised more than 20 percent of its accounts receivables that month, as ineligible accounts for the purpose of calculating Interpharm's borrowing base. (*Id.* ¶ 36.)  The Bank based its decision on these wholesalers' right to "charge back" Interpharm money on certain transactions.  (*See id.* ¶ 38.)  But this, says Interpharm, ignored the fact that charge-backs are a standard practice in the pharmaceutical industry, where drug-makers like Interpharm sell their products to both wholesalers and retailers.  (*Id.* ¶ 37.)  Interpharm's wholesalers frequently sold their products to retailers who also did business directly with (and had negotiated their own prices with) Interpharm.  (*Id.*)  In such cases, the wholesalers could charge Interpharm for the difference between what they paid Interpharm and any lower price that the retailers had negotiated to pay them.  (*Id.*)

With its available credit depleted, Interpharm found itself unable to pay its suppliers and therefore unable to generate enough product to fill its customers' orders. (*Id.* ¶ 41.)  Meanwhile, Wells Fargo continued to ask out of the loan, demanding that Interpharm refinance its debt or sell its assets.  (*Id.* ¶ 45.)  Investment bankers assured Interpharm that it could sell the company for more than $100 million if Interpharm continued to operate as "a going concern with viable supply and customer relationships." (*Id.*)  But to do that, Interpharm needed more working funds.  And Wells Fargo refused to expand its borrowing base; refused to deem Interpharm's wholesaler accounts eligible; and on January 29, 2008 decided to exclude from eligibility another account, that of Watson Pharmaceuticals, even though Watson was paying its bills on time.  (*Id.* ¶ 48.)

On February 1, 2008, Wells Fargo refused to advance Interpharm enough money to make payroll unless it agreed to a new, interim forbearance agreement on Wells

Fargo's terms.  (*Id.* ¶ 52.)  Faced with a choice between signing the interim agreement and bankruptcy, Interpharm signed the interim agreement on February 1 (the "February 2008 Interim Agreement").  In the February 2008 Interim Agreement, Interpharm acknowledged that it was in default of the Credit Agreement and the October 2007 Agreement, and Wells Fargo agreed to forbear from exercising its right till February 4, 2008.  (Wurst Decl. Ex. C, February 2008 Interim Agreement, at 3, 8.)  Interpharm promised to retain a "Chief Restructuring Officer," "acceptable to Wells Fargo in its sole discretion," who would be authorized to prepare a budget under which Interpharm would operate; request advances from Wells Fargo; make payments on Interpharm's behalf; and administer the budget.  (*Id.* at 8–9.)  It also gave Wells Fargo a security interest in certain of its property and waived all claims against the Bank.  (*Id.* at 11.)  Significantly, the February 2008 Interim Agreement amended the definition of "Eligible Accounts" in the Credit Agreement to exclude "Accounts owed by AmeriSource Bergen, McKesson, Cardinal Health, Watson Pharmaceutical, or any other wholesaler, to the extent accrued after January 21, 2008."  (*Id.* at 9.)

On February 5, the parties executed another forbearance agreement (the "February 2008 Agreement").  (Wurst Decl. Ex. C, February 2008 Agreement.)  Under its terms Wells Fargo agreed to forbear from exercising its rights against Interpharm through June 30, 2008, provided that there was no default under the February 2008 Agreement or any new default under the Credit Agreement.  (*Id.* at 9.)  Interpharm agreed to waive all claims against Wells Fargo (*id.* at 6, 14), to reduce its payroll expenses by twenty percent, and to put its real estate on the market.  (Compl. ¶¶ 53, 54.)

According to the complaint, a critical—though unstated—premise of the February 2008 Agreement was that Wells Fargo would continue to include 50 percent of the cost of eligible inventory in calculating its borrowing base.  (*Id.* ¶ 61.)  But on March 6, 2008, Wells Fargo reduced the rate to 39.6 percent after a third-party vendor offered a poor assessment of the inventory's liquidation value.  (*Id.*)  By "unilateral[ly]" reducing the advance rate, Wells Fargo is said to have materially breached the February 2008 Agreement.  (*Id.* ¶ 64.)  The relevant provision in the Credit Agreement in fact permitted Wells Fargo to unilaterally reduce the inventory advance rate below 50 percent to "such lesser rate as the Lender in its reasonable discretion may deem appropriate from time to time."  (Wurst Decl. Ex. A, at 2.)  In any event, the reduction in the advance rate had the effect of shrinking Interpharm's available credit even further.  (*Id.* ¶¶ 68, 69.)  Again faced with the prospect of bankruptcy should it not accede to the Bank's demand for a new forbearance agreement, Interpharm signed a new agreement on March 25, 2008 (the "March 2008 Agreement").

The March 2008 Agreement slightly modified the inventory advance rate from 50 percent to 49 percent or such "lesser rate" that Wells Fargo in its "sole discretion" deemed appropriate.  (Wurst Decl. Ex. A., at 2, 7.)  The agreement also waived all claims Interpharm might otherwise have had against Wells Fargo as of March 25, 2008.  (Compl. ¶ 77.)  Plaintiff admits that the March 2008 Agreement reduced some of Wells Fargo's "onerous restrictions" (*id.* ¶ 79), including amending the definition of "eligible accounts" in the Credit Agreement to include the Watson Pharmaceutical account.  (Wurst Decl. Ex. C, March 2008 Agreement, at 13.)  But Interpharm had been operating with too little credit for too long (Compl. ¶¶ 80, 81), and by this point it had no viable

8

alternative left but to sell off its assets and real property (*id.* ¶ 91).  On April 24, 2008, Interpharm entered into asset purchase agreements with two other companies, with a closing scheduled for June 23, 2008.  (*Id.* ¶¶ 91, 95.)  In early May, Interpharm told Wells Fargo that it could only survive till closing as a "viable entity" if the Bank "agreed to abide by certain aspects of the Credit Agreement" in calculating its available credit.  (*Id.* ¶ 92.)  The complaint does not say what those aspects were.  Wells Fargo agreed to Interpharm's (unspecified) requests on the condition that Interpharm sign a new forbearance agreement entitling the Bank to an additional forbearance fee at closing.  (*Id.* ¶¶ 92, 93.)  On May 12, 2008, the parties entered into such an agreement (the "May 2008 Agreement"), in which Interpharm released all claims against Wells Fargo arising at or prior to May 14, 2008, and Wells Fargo agreed to forbear from exercising its rights against Interpharm unless there was a new default under the Credit Agreement other than Interpharm's "failure to meet its financial covenants related to cumulative net sales and net profit."  (*Id.* ¶ 94; Wurst Decl. Ex. B, at ¶¶ 4(e), 6, 22, 28.)

The parties' disputes continued through June.  Wells Fargo agreed that, after Interpharm's buyers paid it in full, it would release its liens on Interpharm's collateral.  (*Id.* ¶ 95.)  But it still refused to assign its mortgage on certain Interpharm property until after Interpharm waived all claims against it.  Interpharm refused, and it consequently and "unnecessarily incurred over $350,000 in real estate taxes because of the way the property had to be conveyed."  (*Id.* ¶ 96.)  The complaint does not explain why it incurred those taxes.  Finally, when Wells Fargo returned $100,000 that Interpharm had deposited with it as security, it withheld $34,000 in attorneys' fees, the reasons for which it never specified and, when asked, refused to disclose.  (*Id.* ¶ 99.)

At some point after the asset sale—the complaint does not say when—Interpharm "repudiated" the 2008 forbearance agreements in writing.  (*Id.* ¶ 104.)  It brought this lawsuit on December 31, 2008.  Interpharm brings claims for breach of the Credit Agreement and subsequent forbearance agreements (Count 1); breach of the duty of good faith and fair dealing (Count 2); tortious interference with business expectations (Count 3); unjust enrichment (Count 4); and breach of fiduciary duty (Count 5).  (*Id.* ¶¶ 29–34.)

## STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009).  The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Only a "plausible claim for relief survives a motion to dismiss."  *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009).  Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009) (internal quotation marks omitted).

In resolving a Rule 12(b)(6) motion to dismiss, the Court may consider documents attached to the complaint, incorporated in it by reference, or otherwise explicitly referenced in it.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *2 Broadway L.L.C. v. Credit Suisse First Boston Mortgage Capital L.L.C.*, 00-5773, 2001 WL 410074, at \*5 (S.D.N.Y. Apr. 23, 2001) (Lynch, J.).  These

include contracts that the plaintiff's complaint relies upon.  *KiSKA Construction Corp.-USA v. G&G Steel, Inc.*, No. 04-9252, 2005 WL 1225944, at *3 (S.D.N.Y. May 20, 2005).  Where such documents contradict plaintiff's allegations, dismissal is appropriate.  *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

### DISCUSSION

Wells Fargo moves to dismiss the complaint on the ground that Interpharm validly released all potential claims against it.  Assuming that is true, Wells Fargo's argument would not dispose of Interpharm's claims entirely.  The Court first discusses the validity of Interpharm's release, then turns to the claims not governed by its release.

### I.    Validity

There is no doubt that Interpharm signed a number of agreements waiving its claims against Wells Fargo.  Such releases were contained in the October 2007 Agreement, the February 2008 Interim Agreement, the February 2008 Agreement, the March 2008 Agreement, and the May 2008 Agreement.  (Wurst Decl. Ex. C, October 2007 Agreement, at ¶ 15; February 2008 Interim Agreement, at ¶ 17; February 2008 Agreement, at ¶¶ 6, 14; March 2008 Agreement, at ¶ 22; Ex. B, May 2008 Agreement, at ¶ 28.)  The relevant clause in the May 2008 Agreement, which the parties signed on May 14, 2008, is representative of the rest.  The parties agreed to

> waive, release and discharge any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or inequity, arising at or prior to the date hereof, which it or they may have against Wells Fargo and/or its officers and employees in connection with the [Credit] Agreement, this Agreement and all documents executed in connection herewith.  Borrower also agrees that all waivers, releases and agreements made herein are made in consideration of, and in order to induce Wells Fargo to temporarily forbear the exercise or further

exercise of its rights and remedies against the Borrower under the [Credit] Agreement and to induce Wells Fargo to enter into this Agreement.

(Wurst Aff. Ex. B at 20.)  The May 2008 Agreement also contains a merger clause, which

states that "[t]his Agreement represents the entire agreement between Wells Fargo and

the Borrower, all other agreements between Wells Fargo and the Borrower being merged

with this Agreement."  (*Id.* at 20–21.)  Thus as a matter of contract law, this release

provision controls.[7]

It is well settled under New York law[8] that "a valid release which is clear and

unambiguous on its face and which is knowingly and voluntarily entered into will be

enforced as a private agreement between parties."  *DuFort v. Aetna Life Ins. Co.*, 818 F.

Supp. 578, 581 (S.D.N.Y. 1993) (internal quotation marks and citation omitted).  "Where

sophisticated business entities execute mutual releases in the course of arm's length

negotiations, courts are even more scrupulous in holding the parties to their bargain."  *2

Broadway L.L.C.*, 2001 WL 410074, at *6 (citing *VKK Corp. v. National Football

League*, 244 F.3d 114, 123 (2d Cir. 2001)).  A release, then, "is binding on the parties

absent a showing of fraud, duress, undue influence, or some other valid legal defense."

*Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 113 (S.D.N.Y.

2001) (Lynch, J.).

Here, neither party disputes that the May 2008 release provision, like all the

others, is unambiguous.  Interpharm agreed to waive "any and all claims or causes of

action" of "every kind and nature whatsoever, whether at law or in equity, arising at or

prior to" May 14, 2008 that it might otherwise have had against Wells Fargo in

---

[7] The Court notes, however, that its analysis of the issue of validity would not be altered if each release were considered separately.
[8] The parties agree that New York law governs here.

connection with any of the parties' agreements.  (Wurst Aff. Ex. B at 20.)  Moreover, the release was executed at arm's length between two sophisticated parties.  Such agreements are given the "greatest deference" by courts.  *Davis & Assocs.*, 168 F. Supp. 2d at 113–114 (citing *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (N.Y. 1995) ("Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain.")).

Still, Interpharm contends that the release should not be enforced because Interpharm only agreed to it under economic duress from Wells Fargo.  A contract is voidable where entered into under economic duress, *VKK Corp.*, 244 F.3d at 122, although a party seeking to void a release on that ground "shoulders a heavy burden,"[9] *Davis & Assocs.*, 168 F. Supp. 2d at 114 (internal quotation marks and citation omitted). A release executed between two sophisticated parties will be voided for economic duress only in "extreme and extraordinary cases."  *VKK Corp.*, 244 F.3d at 123.  Because "disparity in bargaining power" is common in contract formation, it is not enough simply to show that one party to a contract was at a decided economic disadvantage.  *Id.*; *see Davis & Assocs.*, 168 F. Supp. 2d at 114 ("[A] sophisticated party must do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations."); *Orix Credit Alliance, Inc. v. Hanover*, 582 N.Y.S.2d 153, 154 (N.Y. App. Div. 1992) ("[F]inancial or business pressure of all

---

[9] The plaintiff argues that New York courts disfavor dismissal of economic duress claims before the summary judgment stage.  However, the case Interpharm cites to support its argument says only that, "[w]here fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied." (Pltf.'s Br. 10 (quoting *Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36, 37 (N.Y. App. Div. 1994). The court in *Bloss* plainly did not mean that any economic duress claim, no matter how conclusory, is dismissal-proof.  Rather, it meant that dismissal should be denied when duress is alleged *adequately*.  That is the question the Court must resolve here.

kinds, even if exerted in the context of unequal bargaining power, does not constitute economic duress.").  Rather, a plaintiff must show that it "was compelled to agree to [the contract's] terms by means of a wrongful threat which precluded the exercise of [its] free will."  *Davis & Assocs.*, 168 F. Supp. 2d at 114 (internal quotation marks and citation omitted).  Or, as the Second Circuit has sometimes put it, the plaintiff must show the existence of "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."  *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (citation omitted).  However one states the elements of economic duress, the two fundamental questions are whether a wrongful (unlawful) threat exists and, if it does, whether that threat went so far as to deprive the plaintiff of its free will (that is, take away the plaintiff's alternatives).  Interpharm's complaint does not plausibly allege the existence of either element, let alone both.

## A.      Wrongful Threat

Threats to "breach the agreement by withholding performance unless the other party agrees to some further demand" can support a claim for economic duress.  *Bechard v. Monty's Bay Recreation, Inc.*, 35 A.D.3d 1131, 1131 (N.Y. App. Div. 2006) (internal quotation marks and citation omitted).  But it is "axiomatic" that parties cannot be guilty of economic duress for "failing to grant further forbearance when they had no legal duty to do so."  *Davis & Assocs.*, 168 F. Supp. 2d at 114.  Moreover, "threats to enforce a party's legal rights under a contract—or even that party's interpretation of its rights— cannot constitute a wrongful threat sufficient to establish a claim of economic duress." *Id.* at 115 (quoting *Cooper Development Co. v. Friedman*, No. 92-7572, 1994 WL 62846,

14

at *4 (S.D.N.Y. 1994)).  This last principle suggests that an action cannot amount to a

wrongful threat if the party taking it interprets the contract in good faith to allow it.[10]

  Interpharm does not allege that Wells Fargo took a specific kind of coercive

action—that it made a specific wrongful threat—in order to convince the plaintiff to enter

into the May 2008 Agreement.  It mentions Wells Fargo's motivation (to "extract as

much additional money from [Interpharm] as possible" (Compl. ¶ 92)).  It cites its request

that Wells Fargo "abide by certain aspects of the Credit Agreement in calculating the

borrowing base," and alleges that Wells Fargo conditioned its agreement on formally

signing another forbearance contract.  (*Id.* ¶¶ 92, 93.)  But what the plaintiff does not do

is identify any particular objectionable conduct on the Bank's part during the negotiation

of the May 2008 Agreement.  Nor is it possible to tell from the complaint which

"aspects" of the Credit Agreement Wells Fargo was asked to abide by, or whether Wells

Fargo was presently breaching them.  Given the paucity of Interpharm's account of what

exactly Wells Fargo threatened to do should Interpharm not sign the May 2008

Agreement, there is reason to find that the complaint falls short of alleging a wrongful

threat.  *See S & G Flooring, Inc. v. New York City Dist. Council of Carpenters Pension

Fund*, No. 09-2836, 2009 WL 4931045, at *4 (S.D.N.Y. Dec. 21, 2009) ("the court

distinguishes between factual and conclusory allegations and disregards anything

conclusory, for such statements are 'not entitled to the assumption of truth'") (quoting

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940 (2009)).

---

[10] Although the Court's holding today does not depend on it, there is authority under New York law that even an "alleged lack of good faith upon the part of defendant in performing the original contract, although perhaps constituting a breach of that contract, is insufficient to establish that plaintiff was coerced into executing the release."  *Corvino v. CBS Inc.*, 92 A.D.2d 536, 537 (N.Y. App. Div. 1983).

However, although Interpharm points to no particular wrongful threat Wells Fargo made during the negotiations in May 2008, it does provide a narrative of the Bank's alleged bad behavior during the course of the parties' relationship. When Interpharm defaulted on the Credit Agreement in 2007, Wells Fargo supposedly stepped in to exploit what was a difficult financial period for the plaintiff. Calculatingly, the Bank induced Interpharm's agreement to pay higher interest and fees. It began to tighten Interpharm's credit. When Interpharm asked for more, it demanded that plaintiff enter into additional forbearance agreements, each with harsher terms than the last. Interpharm charges that these actions were commercially unreasonable in breach of the Bank's contractual obligations.

If these actions amounted to wrongful threats, Interpharm could plausibly argue that the threats coerced it to sign the final release, in May 2008, just like they coerced it to sign the earlier ones. A lender cannot escape liability just because, after driving its borrower to the brink with wrongful threats that lead to oppressive contracts, it eases the pressure enough to give the borrower one duress-free moment to waive all its claims. The problem for Interpharm, however, is that its allegations fall well short of describing a wrongful threat at all. Consider the events of 2007. Interpharm faced more competition. Its expenses were high and its sales low. By the third quarter of the year, it had breached certain financial covenants with Wells Fargo. (Compl. ¶ 25.) The plaintiff admits that Wells Fargo was not responsible for this default, which continued throughout 2008 until the date on which all the company's assets were sold to repay its debts.[11] (*Id.*) Given

---

[11] That Interpharm *admits* it defaulted for reasons not of defendant's making distinguishes this case from several cited in Interpharm's brief where courts held that economic duress was viable. *See KiSKA Const. Corp.-USA v. G & G Steel, Inc.*, No. 04-9252, 2005 WL 1225944 (S.D.N.Y. May 20, 2005); *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y. 2d 124 (N.Y. 1971); *Gallagher Switchboard Corp. v. Heckler*

these circumstances, Interpharm's allegations that Wells Fargo forced it to accept onerous terms and to sign the October 2007 Agreement and subsequent agreements (*see id.* ¶¶ 28–29) has an air of unreality about it.  Assuming the terms were onerous at least from a borrower's perspective, plaintiff's assertions prove largely that the Bank drove a hard bargain, not that it did anything unlawful.  *Cf. Gubitz v. Sec. Mutual Life Ins. Co. of New York*, 262 A.D.2d 451, 452 (N.Y. App. Div. 1999) ("financial pressures, even when coupled with inequality in bargaining position, do not, without more, constitute duress"); *Appel v. Ford Motor Co.*, 111 A.D.2d 731, 732–33 (N.Y. App. Div. 1985) ("while the general release may have been the result of hard bargaining, the mere fact that [defendant] threatened to exercise its right in order to obtain the release cannot be deemed coercion").  After all, Wells Fargo was legally entitled, in late 2007, to call all of Interpharm's debt and liquidate its collateral to pay that debt off.  Threatening to do what one is legally entitled to do cannot constitute a wrongful threat.  *See Madey v. Carman*, 51 A.D.3d 985, 987 (N.Y. App. Div. 2008) ("There is no actionable duress . . . where, as here, the alleged menace was to exercise a legal right.").  The complaint also claims that Wells Fargo reneged on its "vague[] propos[al] to negotiate new financial covenants" for early 2008.  (Compl. ¶ 31.)  But even if Wells Fargo did propose this, and even if it never followed through, Interpharm does not explain how that vague, oral proposal could have been legally enforceable in the first place.  A plaintiff cannot "avoid the consequences of his written consent and, where the alleged misrepresentations conflict with the terms of a

---

*Elec. Co.,* 229 N.Y.S.2d 623 (N.Y. Sup. Ct. Kings Co. 1962).  In each of these cases—which involved disputes about contracts for the sale of goods, not lending agreements—the seller allegedly threatened to withhold delivery of the goods to coerce the buyer into agreeing to a release or some other new term.  In none of them did the party seeking to avoid the release admit its default.  *See also Sosnoff v. Carter*, 165 A.D.2d 486, 490–91 (N.Y. App. Div. 1991) (possible economic duress where a real estate developer agreed to supply 80 percent of the equity and collateral in a development, repudiated his obligation "just days before the scheduled acquisition," then forced the other partner to agree to convert his previous capital contributions into debt).

written agreement, there can be no reasonable reliance as a matter of law." *Ruffino v. Neiman*, 17 A.D.3d 998, 1000 (N.Y. App. Div. 2005) (internal citations omitted).

Interpharm's only claims of wrongful threats are that Wells Fargo acted unilaterally and unreasonably by (1) as of January 20, 2008, excluding receivables from three (later four) wholesalers in calculating plaintiff's borrowing base; and (2) as of March 6, 2008, reducing the percentage of Interpharm's eligible inventory that could be factored into calculating its borrowing base, from an inventory advance rate of 50 percent to 39.6 percent. (*Id.* ¶¶ 39, 41, 48, 61.) Read most generously, this is a breach of contract claim. Even if that claim is well-founded, so long as Wells Fargo was just enforcing its own good-faith interpretation of its contract rights, it could not have made a wrongful threat. *See Davis & Assocs.*, 168 F. Supp. 2d at 115; *DuFort*, 818 F. Supp. at 582 (dismissing claim for economic duress where valid dispute as to parties' rights under contract existed and insurance company asserted its interpretation of its rights). It also bears noting that under the explicit terms of the Credit Agreement Wells Fargo was entitled to act unilaterally in adjusting the credit terms. (Wurst Decl. Ex. A, at 2, 5–6.) At best, then, plaintiff's claim of wrongful conduct is that Wells Fargo exercised its discretion unreasonably. But faced with a borrower in continued default of its financial covenants, there appears to be nothing "wrongful" in a lender exercising its right to increase its level of security as its borrower becomes less creditworthy.

The complaint, moreover, omits two crucial facts that bear directly on these allegations. In the February 2008 Interim Agreement the parties expressly agreed to exclude McKesson, AmerisourceBergen, Cardinal Health, Watson Pharmaceutical, and "any other wholesaler" from eligibility. (*See* Wurst Decl. Ex. C, February 2008 Interim

18

Agreement, at 9.)  And in the March 2008 Agreement the parties expressly agreed Wells

Fargo would have "sole discretion" in deciding what the inventory advance rate would

be.  (*See* Wurst Decl. Ex. C, March 2008 Agreement, at 13.)  If they were viable at all,

Interpharm's claims for breach of contract would be limited: twelve days after Wells

Fargo began excluding McKesson, AmerisourceBergen, and Cardinal Health (and two

days after it began excluding Watson), the parties agreed to the exclusion of all

wholesaler accounts from calculation of the borrowing base.  Similarly, three weeks after

Wells Fargo began using an inventory advance rate of 39.6 percent rather than 50

percent, plaintiff agreed that the Bank had the sole discretion to set that rate.  Plaintiff

does not cite any cases, and the Court has found none, that would support a finding that

Wells Fargo's actions constitute actionable duress.

**B.       Deprivation of Free Will**

The parties agree that from mid-2007 onward, Interpharm's poor financial

circumstances put it at a decided disadvantage in negotiations with Wells Fargo.  But this

is not enough to establish economic duress; the plaintiff must also show the wrongful

threats *themselves* precluded it from exercising its free will at the bargaining table.  A

plaintiff's free will is precluded when (1) it would have suffered "irreparable harm" had

the wrongful threat been carried out, and (2) it was bereft of alternatives to signing the

contract.[12]  *See Davis & Assocs.*, 168 F. Supp. 2d at 116.  Interpharm's allegations are

insufficient to satisfy both prongs.

---

[12] Courts have sometimes treated the question of adequate remedies separately from the question of
deprivation of free will.  *See Nelson v. Stanley Blacker, Inc.*, 713 F. Supp. 107, 110 (S.D.N.Y. 1989)
(discussing the issues as distinct elements).  It seems logical, however, to view irreparable harm and a lack
of adequate remedies as two sides of the same coin.  Without adequate remedies, any harm suffered is

## 1.      Irreparable Harm

On the issue of irreparable harm, Interpharm's factual allegations present an equivocal picture.  On one hand, Interpharm's dire straits were originally of its own making.  On the other, the complaint alleges that Interpharm's business could have recovered had Wells Fargo not wrongfully pressured it with commercially unreasonable demands in violation of the Credit Agreement.  (*See* Compl. ¶¶ 37, 41.)

The complaint concedes that Interpharm was in such financial trouble in 2007 that it defaulted on the Credit Agreement, well before Wells Fargo did anything even arguably wrong: the plaintiff's sales were low, expenses were high, net income was lower than in 2006, and competition had increased.  (*Id.* ¶ 22.)  Although Interpharm claims these problems were "remediable," it also admits that, after it defaulted in mid-2007, "additional funds would be required to continue executing the company's plan.  (*Id.* ¶¶ 22, 26).  That is putting things delicately; Wells Fargo would have been within its rights at that point to call Interpharm's loan and sell off its assets to recover what the Bank was owed.  Instead, it negotiated a forbearance agreement, which the plaintiff promptly defaulted on.  (*Id.* ¶¶ 28, 30.)  Although Interpharm blamed the default in part on Wells Fargo's "onerous terms," those terms were a result of Interpharm's poor bargaining position, not any wrongful threat against the plaintiff.

As noted, Interpharm also alleges that its business could have recovered absent Wells Fargo's decisions to exclude receivables from wholesaler accounts in calculating its borrowing base and to reduce the advance rate on its inventory.  (*Id.* ¶¶ 41, 43.)  Plaintiff's theory is that the exclusions and reductions depleted its cash to the point that it

---

irreparable.  *Cf. Davis & Assocs.*, 168 F. Supp. 2d at 116, 117 n.3 (addressing the issue of adequate alternative remedies in a section of the opinion on deprivation of free will).

had difficulty paying its suppliers, which in turn kept it from getting enough supply to generate product.  (*Id.* ¶ 41.)  Of course, on February 1, 2008, while Interpharm was admittedly in default of the October 2007 Agreement, it agreed to the exclusion of receivables from the wholesaler accounts, and on March 25 to Wells Fargo's power to reduce the advance rate on its inventory.  Unfavorable contract terms, even if they damaged Interpharm's business prospects, are not by themselves irreparable harm. Whether Interpharm's free will was precluded depends on whether Wells Fargo's conduct put it at risk of such harm before the February, March, and May 2008 Agreements were ever formed.  Interpharm's allegations provide little support for such a conclusion.

### 2.    Absence of Alternatives

Assuming *arguendo* that Wells Fargo made wrongful threats against Interpharm that, had it followed through on them, would have caused the plaintiff irreparable harm, Interpharm has not shown why it had no other recourse than to enter into successive forbearance agreements.  "[O]ne cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement."  *Reid v. IBM Corp.*, No. 95-1755, 1997 WL 357969, at *7 (S.D.N.Y. Jun. 26, 1997) (internal quotation marks and citation omitted); *Indust. Recycling Syst., Inc. v. Ahneman Assocs., P.C.*, 892 F. Supp. 547, 549 (S.D.N.Y. 1995) (economic duress can only be shown if "the circumstances permitted no other alternative" to signing the contract).  "[T]he law is clear that the mere inability to pay one's bills is not enough to demonstrate a lack of a practical alternative to signing the release."  *Shain v. Ctr. for Jewish History, Inc.*, No. 04-1762, 2006 WL 3549318, at * 5 (S.D.N.Y. Dec. 7, 2006).  So long as the plaintiff has an adequate legal

remedy, it cannot claim economic duress.  *See Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir. 1979) ("A threatened breach of contract for which there are adequate legal remedies does not constitute duress."); *Davis & Assocs.*, 168 F. Supp. 2d at 117 n.3.

Interpharm had not one but three alternatives to signing the May 2008 Agreement, or any of the predecessor agreements for that matter.  First, as Interpharm itself acknowledges, it could have filed for bankruptcy.  (*See* Compl. ¶ 102; Pltf.'s Br. 4, 8.) Plaintiff's argument to the contrary—that bankruptcy does not count as an alternative— lacks citation to legal authority and is unpersuasive.  For a business in default of its credit agreement, without the money to pay bills as they come due, voluntary bankruptcy is actually a quite reasonable remedy.  On exactly that logic, a bankruptcy court in this district recently found that the plaintiff's complaint had failed to show economic duress: since it "could have chosen to file for bankruptcy at an earlier point," plaintiff could not "demonstrate that [it] had no alternative, at any time, than to accede to [the creditor bank's] demands."[13]  *In re Marketxt Holdings Corp.*, 361 B.R. 369, 401 (S.D.N.Y. Bankr. 2007).  Second, if Interpharm's accounts receivable collateral was truly "blue chip," as it claims (*see* Compl. ¶ 36), the plaintiff could have found a new lender to replace Wells Fargo.  *See also Home & City Sav. Bank v. Jamel Realty Corp.*, 186 A.D.2d 936, 938–39 (N.Y. App. Div. Oct. 29, 1992) (noting that "there was plenty of time . . . for [the borrower] to seek funds from another bank if the agreed-upon amount was insufficient"); *cf. Sosnoff v. Carter*, 165 A.D.2d 486, 491 (N.Y. App. Div. 1991) (holding that an economic duress claim was viable because the parties claiming it "show[ed] that they

---

[13] Interpharm tries to distinguish *In re Marketxt* away on the ground that the defendant in that case did not cause the plaintiff's precarious financial position.  (Pltf.'s Br. 8–9.)  But although that decision gave several reasons why the plaintiff had not properly alleged economic duress, there is no question that one of those reasons was plaintiff's inability to prove a lack of alternatives.  It could have filed for bankruptcy earlier and simply chose not to.

[had] explored other financing possibilities, without success").  Third, Interpharm could have sued to "enforce the agreement it now claims was breached."  *Davis & Assocs.*, 168 F. Supp. 2d at 117 n.3; *Nelson v. Stanley Blacker, Inc.*, 713 F. Supp. 107, 110 (S.D.N.Y. 1989) ("Under New York law, a party may not prevail on an economic duress claim unless the party demonstrates that a breach of contract action would have been impossible when the threat was made.").  And it could have done so well before May 2008.  In January 2008, Interpharm apparently complained that Wells Fargo's exclusion from the borrowing base of receivables of three of its accounts was a breach of the Credit Agreement.  And according to the complaint, Interpharm told Wells Fargo in mid-March of 2008 that it had breached the parties' latest forbearance agreement, to which a Wells Fargo employee allegedly said, "so sue us."  (Compl. ¶ 67.)  Interpharm chose not to.

That Interpharm had alternatives at hand makes this case importantly different from those cited in its brief where economic duress was found.  *See KiSKA Const. Corp.- USA v. G & G Steel, Inc.*, No. 04-9252, 2005 WL 1225944 (S.D.N.Y. May 20, 2005); *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y. 2d 124 (N.Y. 1971); *Gallagher Switchboard Corp. v. Heckler Elec. Co.,* 229 N.Y.S.2d 623 (N.Y. Sup. Ct. Kings Co. 1962).  In each of those cases, after the parties entered into a contract for the sale of goods, the seller allegedly threatened to refuse delivery in order to procure a release or more favorable contract terms.  *See KiSKA*, 2005 WL 1225944, at *2-*3; *Austin*, 29 N.Y.2d at 129; *Gallagher*, 229 N.Y.S.2d at 627.  In each, a central allegation was that the buyer was put at risk of being held in default by a third party as a result of the seller's threatened breach.  *See KiSKA*, 2005 WL 1225944, at *2; *Austin*, 29 N.Y.2d at 131; *Gallagher*, 229 N.Y.S.2d at 629–30.  In *Austin*, for example, in connection with a

company's contract to produce radar equipment for the Navy on a strict deadline, it awarded subcontracts for gear parts. *Id.* at 128–29. After one subcontractor threatened to stop delivery unless the company agreed to pay it more, and after checking with ten other manufacturers—none of whom could produce the parts in time—the company agreed to the subcontractor's proposed terms. *Id.* at 129. This was a "classic case" of duress, because accepting breach and suing for damages would not have been an adequate remedy—the company would "still have had to obtain the gears elsewhere," and it could not have done so in time. *Id.* at 131, 133. Interpharm's range of alternatives stands in stark contrast to the radar company's lack of alternatives in *Austin*. It could have sued for Wells Fargo's alleged breach in January 2008; it could have opted for bankruptcy to protect itself from its creditors; and it could have sought out another lender. Just because Interpharm chose no other options does not mean it had none. For these reasons the Court finds that Interpharm has not alleged facts that would support a finding of economic duress. The release that the parties signed in May of 2008 controls here.

## II.      The Unreleased Claims

The only remaining question is whether that release disposes of all of Interpharm's claims. The release waived and discharged "any and all claims or causes of action, if any, of every kind and nature whatsoever, whether at law or in equity, arising at or prior to [May 14, 2008]." (Wurst Aff. Ex. B at 20.) Wells Fargo seems to argue in passing that this language is broad enough to waive even claims based on "rights that ha[d] not yet matured" as of May 14. (*See* Def.'s Br. 12.) That would take this release too far. In the cases Wells Fargo cites for this proposition, the releases clearly contemplated future claims. *See Troy News Co., Inc. v. City of Troy*, 167 A.D.2d 730,

731 (N.Y. App. Div. 1990) (language of release "clearly encompassed future claims");
*Northrup Contracting, Inc. v. Village of Bergen*, 129 A.D.2d 1002, 1003 (N.Y. App. Div.
1987) (language extended to "costs, charges or damages of whatever nature, past, present
or future").  This release, by contrast, waives only claims "arising at or prior to" the date
the parties signed the agreement.  That disposes of most, but not all, of plaintiff's claims.
Two claims survive.

   First, the complaint alleges that after the parties signed the May 2008 Agreement,
Wells Fargo breached its "contractual obligations" by "refus[ing] to assign its mortgage
on certain [Interpharm] real estate it was obligated to convey upon payment at the
closing" unless Interpharm agreed to yet another release.  (Compl. ¶ 96.)  Interpharm
refused, and it claims that Wells Fargo's breach caused it to incur an unnecessary
$350,000 in real estate taxes.  (*Id.*)  These allegations could be more specific, but the
Court finds that they are enough to support a claim for breach of contract and breach of
the duty of good faith and fair dealing.  Second, the complaint asserts that Wells Fargo
wrongfully withheld $34,000 of Interpharm's money from it in unspecified "attorneys'
fees," and that the Bank refused to explain what these fees were for.  (*Id.* ¶ 99.)  This
allegation also states a claim for breach of contract and breach of the duty of good faith
and fair dealing.  As to this pair of allegations, Interpharm's claims for breach of contract
(Count 1) and breach of the duty of good faith and fair dealing (Count 2) will survive.

## CONCLUSION

For the reasons given above, Wells Fargo's motion to dismiss [13] is granted in part and denied in part. It is granted as to plaintiff's third, fourth, and fifth causes of action. It is also granted as to plaintiff's first and second causes of action, except to the extent they are brought for claims arising after May 14, 2008. These claims will survive. SO ORDERED.

Dated: New York, New York
     March **31** , 2010

                               Richard J. Holwell
                           United States District Judge